# IN THE SUPREME COURT OF TENNESSEE
# AT NASHVILLE
April 9, 2018 Session

## LUDYE N. WALLACE v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE ET AL.

**Appeal by Permission from the**
**Chancery Court for Davidson County**
**No. 18-0254-I       Claudia Bonnyman, Chancellor**

_____

### No. M2018-00481-SC-RDM-CV

_____

We assumed jurisdiction over this appeal pursuant to Tennessee Code Annotated section 16-3-201(d)(1) and Rule 48 of the Rules of the Tennessee Supreme Court and ordered expedited briefing and oral argument. The issue we must determine is whether the vacancy in the Office of Mayor of Metropolitan Nashville and Davidson County may be filled at the August 2, 2018 election, or whether it must be filled at a special election pursuant to section 15.03 of the Metropolitan Charter. We conclude that section 15.03 of the Metropolitan Charter requires that a special election be set, that the Davidson County Election Commission therefore acted in contravention of the Charter in setting the election on August 2, 2018, and that the trial court erred in denying Mr. Wallace's claims for relief and dismissing this case. Accordingly, the judgment of the trial court is reversed. The Commission is hereby ordered to set a special election in accordance with Tennessee Code Annotated section 2-14-102(a). This opinion is not subject to rehearing under Tennessee Rule of Appellate Procedure 39, and the Clerk is directed to certify this opinion as final and to immediately issue the mandate.

**Tenn. Code Ann. § 16-3-201(d)(1) Appeal by Permission; Judgment of the Chancery Court Reversed with Instructions**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Daniel A. Horwitz and Jamie R. Hollin, Nashville, Tennessee, for the appellant, Ludye N. Wallace.

Lora Barkenbus Fox and Catherine J. Pham, Nashville, Tennessee, for the appellees, Metropolitan Government of Nashville & Davidson County and Davidson County Election Commission.

**OPINION**

## I. Factual and Procedural History

On March 6, 2018, the Mayor of Metropolitan Nashville and Davidson County, Tennessee resigned. On that same date, the Metropolitan Clerk notified the Davidson County Administrator of Elections of the vacancy in the Office of Mayor. On March 9, 2018, the Davidson County Election Commission (the "Commission") met, in part, for the purpose of setting a date for an election to fill the vacancy in the Office of Mayor. The Commission heard a brief presentation by legal counsel for the Commission, discussed the matter, heard public comment, including comment by counsel for Mr. Wallace, and further discussed the matter.[1] The Commission then voted three to two against filing a declaratory judgment action seeking judicial guidance; three to two against setting the election on May 1, 2018; and three to two in favor of setting the election on August 2, 2018.

On March 12, 2018, Mr. Wallace filed in the Chancery Court for Davidson County, Tennessee a "Petition for Writ of Certiorari and Writ of Mandamus," naming as defendants the Metropolitan Government of Nashville and Davidson County ("Metro") and the Commission. Mr. Wallace asserted jurisdiction pursuant to Tennessee Code Annotated sections 27-9-101 (common law writ of certiorari), 29-25-102 (mandamus), and 29-14-102 (declaratory judgment).[2] Mr. Wallace alleged that he is a citizen and

---

[1] These actions appear contrary to the allegation in Mr. Wallace's petition that the Commission conducted no substantive discussion and had pre-determined the date of the election. Regardless, Mr. Wallace has not challenged the adequacy or propriety of the procedure employed by the Commission.

[2] We recently reiterated that the proper method of challenging an administrative decision or action and the type of judicial review available is dependent on the nature of the administrative decision or action. See McFarland v. Pemberton, 530 S.W.3d 76, 103 (Tenn. 2017). Review by common law writ of certiorari is reserved for judicial or quasi-judicial decisions and actions in which the determination is accompanied by a record of the evidence produced and the procedures had. Id. Review of a legislative action, in contrast, is by means of a declaratory judgment action. Id. Mandamus is not available for review of either a judicial or quasi-judicial decision or action or a legislative action; rather, it is only available to enforce a ministerial act or duty. State ex rel. Weaver v. Ayers, 756 S.W.2d 217, 220-21 (Tenn. 1988); State ex rel. Metro. Gov't of Nashville & Davidson Cnty., TN v. State, 534 S.W.3d 928, 930-31 (Tenn. Ct. App. 2017), perm. app. denied (Tenn. Aug. 18, 2017). Although a ministerial act is generally one for which the law prescribes and defines the duties to be performed with precision and certainty, leaving nothing to discretion or judgment, State ex rel. Metro., 534 S.W.3d at 931, an agency performing a ministerial act "has the power and duty to make an 'initial determination' whether the law authorizes the acts it is required to perform." City of Memphis v. Shelby Cnty. Election Comm'n, 146 S.W.3d 531, 536 (Tenn. 2004).

resident of Nashville and that he is a qualified candidate for the Office of Mayor. He alleged that the action of the Commission in setting the election to fill the vacancy in the Office of Mayor on August 2, 2018, was in contravention of the Metropolitan Charter (the "Charter") and so was arbitrary, capricious, and illegal. Mr. Wallace further alleged that the effect of the Commission's action was to deny him the right to seek election to the Office of Mayor because it extended the election period. According to Mr. Wallace, he lacks the financial resources to run a campaign for this additional election period. Mr. Wallace sought a writ of certiorari voiding the action of the Commission, a declaratory judgment declaring the action of the Commission illegal, and a writ of mandamus ordering that the Commission set a special election in May 2018, pursuant to Tennessee Code Annotated section 2-14-102. Mr. Wallace also filed a motion for extraordinary relief and for an expedited hearing.

On March 12, 2018, the trial court issued a writ of certiorari and directed Metro and the Commission to forward to the Clerk and Master of the Chancery Court a transcript and complete record of the proceedings before the Commission. On that same date, the trial court granted Mr. Wallace's motion for an expedited hearing and set the hearing for March 14, 2018.

On March 13, 2018, Metro and the Commission filed a motion to dismiss on the ground of failure to state a claim upon which relief may be granted pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure. Metro and the Commission subsequently filed a declaration of the Administrator of Elections with exhibits, including a digital recording of the Commission's March 9, 2018 meeting.[3] The trial court conducted a hearing on March 14, 2018. The parties agreed that the hearing and the subsequent ruling of the trial court would constitute a final adjudication of and judgment on the merits, and the trial court considered the matter accordingly. The trial court issued a ruling from the bench, finding that Mr. Wallace was not entitled to the relief sought. On March 16, 2018, the trial court entered its final order, adjudicating the case on the

In this case, it is difficult to precisely determine the parameters of the decision or action of the Commission. The limited record and proceedings, however, suggest that the Commission acted in a ministerial capacity in setting the date for the election to fill the mayoral vacancy under the Charter, even though the Commission was required to make an initial determination of what the Charter authorized. This would suggest that mandamus is the proper vehicle for review. That being said, the inquiry in this case is the same, regardless of the mechanism of review. As will be discussed, infra, the issue in this case is whether the Charter authorizes the setting of the election to fill the mayoral vacancy on August 2, 2018, or instead requires the setting of a special election, such that the decision and action of the Commission were invalid. See McCallen v. City of Memphis, 786 S.W.2d 633, 641-42 (Tenn. 1990).

[3] A supplemental record now has been filed containing a transcript of the Commission's March 9, 2018 meeting.

merits. Based on its construction of section 15.03 of the Charter, the trial court concluded: "[T]here is a general metropolitan election scheduled within 12 months after the March 6, 2018 vacancy in the office of mayor, and, therefore, no special election is required. The August 2, 2018 election, a general election where several metropolitan government offices appear on the ballot, is a metropolitan general election. Accordingly, the Election Commission did not err in setting the mayoral election for August 2, 2018." The trial court denied mandamus relief and dismissed the case "in its entirety."[4]

On March 15, 2018, Mr. Wallace filed a notice of appeal. On that same date, he filed in this Court a motion requesting that we assume jurisdiction pursuant to Tennessee Code Annotated section 16-3-201(d)(1) and Rule 48 of the Rules of the Tennessee Supreme Court.[5] By Order filed March 22, 2018, this Court granted Mr. Wallace's motion, assumed jurisdiction over this appeal, and set an expedited briefing schedule and oral argument. Oral argument for this case was held on April 9, 2018.

## II. Analysis

### A. Standard of Review[6]

The issue before us is whether section 15.03 of the Charter authorizes the Commission to set the election to fill the current mayoral vacancy on August 2, 2018, or whether it instead requires the setting of a special election, as Mr. Wallace contends. This issue requires the Court to construe section 15.03 of the Charter and, more particularly, the phrase "general metropolitan election" as used in this section.

The principles of statutory construction guide us in our interpretation of the Charter. See Renteria-Villegas v. Metro. Gov't of Nashville & Davidson Cnty., 382 S.W.3d 318, 321 (Tenn. 2012); Jordan v. Knox Cnty., Tenn., 213 S.W.3d 751, 763 (Tenn. 2007). Statutory interpretation and the application of a statute to the facts of a

---

[4] On March 13, 2018, David Hiland filed a motion to intervene in this case. Mr. Hiland subsequently filed a separate lawsuit, and the trial court never ruled on his motion to intervene. Metro and the Commission also filed a motion to dismiss in Mr. Hiland's case, and the motions in both suits were heard at the same time. The trial court's final order was entered in both cases. Mr. Hiland is not a party to this appeal.

[5] Because Mr. Wallace's notice of appeal filed on March 15, 2018, in the Court of Appeals was premature, it and his motion were deemed filed as of March 16, 2018, the date on which the trial court entered its final order.

[6] Although Metro and the Commission filed a motion to dismiss, the parties and the trial court treated the proceedings in that court as a final adjudication of and judgment on the merits. We review this matter in that posture.

case involve questions of law and are reviewed under a de novo standard of review with no presumption of correctness afforded to the trial court. Tenn. Dep't of Corr. v. Pressley, 528 S.W.3d 506, 512 (Tenn. 2017); Arden v. Kozawa, 466 S.W.3d 758, 764 (Tenn. 2015). We thus independently review the relevant provisions of the Charter without any deference to the interpretations of the Commission or the trial court. See Pressley, 528 S.W.3d at 512.[7]

The overriding purpose of a court in construing a statute is to ascertain and effectuate the legislative intent, without either expanding or contracting the statute's intended scope. Ray v. Madison Cnty., Tenn., 536 S.W.3d 824, 831 (Tenn. 2017); Pressley, 528 S.W.3d at 512. Legislative intent is first and foremost reflected in the language of the statute. Lee Medical, Inc. v. Beecher, 312 S.W.3d 515, 526 (Tenn. 2010). "We presume that the Legislature intended each word in a statute to have a specific purpose and meaning." Arden, 466 S.W.3d at 764. The words used in a statute are to be given their natural and ordinary meaning, and, because "words are known by the company they keep," we construe them in the context in which they appear and in light of the general purpose of the statute. Lee Medical, 312 S.W.3d at 526; Ray, 536 S.W.3d at 831. "We endeavor to construe statutes in a reasonable manner 'which avoids statutory conflict and provides for harmonious operation of the laws.'" Ray, 536 S.W.3d at 831 (citation omitted). When a statute's text is clear and unambiguous, we need look no further than the language of the statute itself. Lee Medical, 312 S.W.3d at 527. "We simply apply the plain meaning without complicating the task." Pressley, 528 S.W.3d at 513.

---

[7] Metro and the Commission assert that the Court must afford deference to the Commission's and the State Election Coordinator's construction of section 15.03 of the Charter. We disagree. This is not a case in which an administrative agency has construed and applied its own rules or policies. The issue in this case is the proper construction of a provision of the Charter. In contrast to Gay v. City of Somerville, 878 S.W.2d 124, 127 (Tenn. Ct. App. 1994), relied on by Metro and the Commission, the construction of the relevant provision of the Charter in this case was by the Commission, not by the body responsible for the promulgation of the provision. To the extent that the Commission's interpretation of the Charter is akin to an agency's interpretation of its controlling statutes, we are not bound by that interpretation, particularly where the controlling statute is not ambiguous. Pickard v. Tenn. Water Quality Control Bd., 424 S.W.3d 511, 523 (Tenn. 2013). The Commission's interpretation of the Charter is certainly entitled to our respect; however, it is not entitled to our deference. H & R Block E. Tax Servs., Inc. v. State, Dep't of Commerce & Ins., Div. of Ins., 267 S.W.3d 848, 854-55 (Tenn. Ct. App. 2008).

While the State Election Coordinator is statutorily charged with authoritatively interpreting the election laws, see Tenn. Code Ann. § 2-11-202(4); Pemberton, 530 S.W.3d at 92, the relevant provisions of the Charter at issue in this case are not State election laws subject to his authoritative interpretation under the statute. See Charter, § 15.04. To the extent that the State Election Coordinator offered an interpretation of the Charter in this case, it is not entitled to deference.

- 5 -

When, however, the language of a statute is ambiguous, we resort to rules of statutory construction and external sources in order to ascertain and give effect to the legislative intent. Lee Medical, 312 S.W.3d at 527; Ray, 536 S.W.3d at 832. These external sources may include the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, and legislative history. [8] Lee Medical, 312 S.W.3d at 527-28; Ray, 536 S.W.3d at 831-32. The language of a statute is ambiguous when it is subject to differing interpretations which yield contrary results. In re Hogue, 286 S.W.3d 890, 894 (Tenn. 2009). "This proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of the statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute." Powers v. State, 343 S.W.3d 36, 50 n.20 (Tenn. 2011).

### B. Construction of the Charter

Section 15.03 of the Charter provides:

Sec. 15.03. - Special elections.

*There shall be held a special metropolitan election to fill a vacancy for the unexpired term in the office of mayor and in the office of district council member whenever such vacancy shall exist more than twelve (12) months prior to the date of the next general metropolitan election.* The special election shall be ordered by the county commissioners of elections and they shall give notice thereof as provided by Tennessee Code Annotated section 2-14-105. When a vacancy exists in the office of vice mayor or in the office of councilmember-at-large, said office shall remain vacant until the next general election at which time such vacancy shall be filled; however, in no event shall a special election be held to fill such vacancy. If in such special election to fill a vacancy for the unexpired term of the office of mayor or district council member, or in the general election at which time a vacancy in the office of vice mayor or councilmember-at-large, no candidate shall receive a majority of all the votes cast for such office, a runoff election shall be held five (5) weeks subsequent to the first special election to fill a vacancy in accordance with the provisions hereinbefore set

---

[8] In the case of statutes, we also may consider the caption of the statute. Hyatt v. Taylor, 788 S.W.2d 554, 556 (Tenn. 1990); Ray, 536 S.W.3d at 832. The same, however, is not true with respect to the Charter. Section 18.07 of the Charter expressly instructs that the titles appearing before the articles, chapters, and sections of the Charter are not a part of the Charter and are "not intended to determine or to restrict the meaning of its provisions."

forth in the case of a general metropolitan election. The provisions of section 15.01 hereof with respect to voting in general metropolitan elections and with respect to qualifying as a candidate shall apply to special elections and to general elections at which time a vacancy is filled.

(Emphasis added).

Section 15.01 of the Charter provides that the Mayor, Vice Mayor, Councilmen-at-Large and District Councilmen are to be elected at a "general metropolitan election," held on the first Thursday in August of every fourth odd-numbered year, beginning in 1971. The term for each of these offices is four years and expires upon the election and qualification of a successor. See Charter, §§ 3.02, 5.02, and 5.05.

It is undisputed that, in accordance with section 15.01 of the Charter, the next regularly scheduled general metropolitan election for Mayor is to be held on August 1, 2019. Mr. Wallace contends that a special election is required under section 15.03 of the Charter because August 1, 2019 is the next "general metropolitan election" and it is more than twelve months after the March 6, 2018 vacancy. Metro and the Commission, in contrast, contend that any municipal general election constitutes a "general metropolitan election" and that the municipal general election scheduled for August 2, 2018, at which a number of other municipal officers will be elected, is the next "general metropolitan election." Because that general election is less than twelve months from the date of the vacancy, Metro and the Commission contend that no special election is required under section 15.03 of the Charter. We, therefore, are called upon to construe section 15.03 of the Charter, and specifically the meaning of the phrase "general metropolitan election" as used in that section.

Article 15 of the Charter deals exclusively with elections for the offices of Mayor, Vice Mayor, Councilmen-at-Large, and District Councilmen. As noted, section 15.01 provides that the Mayor, Vice Mayor, Councilmen-at-Large, and District Councilmen are elected in a particular type of municipal general election, referred to as a "general metropolitan election." The general metropolitan election for these enumerated offices is held every fourth odd-numbered year beginning in 1971.

Section 15.03 of the Charter, in turn, provides for elections to fill vacancies in the offices of Mayor, Vice Mayor, Councilmen-at-Large, and District Councilmen. This section draws a clear and critical distinction between elections to fill vacancies in the offices of Mayor and District Councilmen, on the one hand, and vacancies in the offices of Vice Mayor and Councilmen-at-Large, on the other hand. Vacancies in the offices of Mayor and District Councilmen are to be filled by special metropolitan election "whenever such vacancy shall exist more than twelve (12) months prior to the date of the

- 7 -

*next general metropolitan election.*"  Charter, § 15.03 (emphasis added).  In contrast, vacancies in the offices of Vice Mayor and Councilmen-at-Large are never to be filled by special election.  Rather, these offices "shall remain vacant until the *next general election at which time such vacancy shall be filled.*"  Charter, § 15.03 (emphasis added).  Section 15.03 reinforces this differentiation in the use of the phrase "general metropolitan election" and the phrase "general election" in its differing treatment of the elections to fill vacancies in the different offices subject to Article 15.  Section 15.03 provides, for example, that

> [i]f in such *special election* to fill a vacancy for the unexpired term of the *office of mayor or district council member*, or in the *general election* at which time a vacancy in the *office of vice mayor or councilmember-at-large* [is filled], no candidate shall receive a majority of all the votes cast for such office, a runoff election shall be held five (5) weeks subsequent to the first special election to fill a vacancy in accordance with the provisions hereinbefore set forth in the case of *a general metropolitan election*.

(Emphasis added).  Section 15.03 further provides: "The provisions of section 15.01 hereof with respect to voting in *general metropolitan elections* and with respect to qualifying as a candidate shall apply to *special elections and to general elections* at which time a vacancy is filled." (Emphasis added).

That the intent of the drafters of the Charter was to draw a distinction between "general metropolitan elections" and all other "general elections" is evidenced by the use of these distinct phrases within section 15.03 to address different events.  We do not read the use of the distinct phrases "general metropolitan election" and "general election" to be merely accidental.  Rather, we view the two phrases to have been intentionally and thoughtfully employed to refer to different elections.  The former phrase refers to the particular general election at which the Mayor, Vice Mayor, Councilmen-at-Large, and District Councilmen are elected in August of each fourth odd-numbered year, beginning in 1971, as called for in section 15.01 of the Charter.  In contrast, the latter phrase refers more broadly to any municipal general election, including but not limited to general metropolitan elections.  In other words, "general metropolitan elections" are one unique type of the broader category of municipal "general elections."  All municipal "general elections," however, are not "general metropolitan elections."

The distinction between the phrases "general metropolitan election" and "general election" is further evidenced by the fact that the Charter employs the former phrase only with respect to elections involving the offices of Mayor, Vice Mayor, District Councilmen, and Councilmen-at-Large.  Indeed, with the exception of Article 15, the Charter utilizes the phrase "general metropolitan election" in only one other instance,

- 8 -

Article 18, section 18.06. That section addresses the election of District Councilmen following re-districting. The election of District Councilmen falls under Article 15 of the Charter, so the use of the phrase "general metropolitan election" in section 18.06 is entirely consistent with the limited use of the phrase in Article 15 of the Charter. In contrast, other elected officials of the Metropolitan Government are elected in "general elections" held in different years. See, e.g., Charter, section 14.05 (General Sessions Court Judges elected in August of every eighth even-numbered year, beginning in 1974); section 14.10 (Public Defender elected in August of every fourth even-numbered year, beginning in 1966). These other sections of the Charter governing the election of other officers of the Metropolitan Government do not use the phrase "general metropolitan election." Rather, they refer simply to a "general election." The same is true with respect to the filling of vacancies in these other offices. See Charter, §§ 14.10, 14.13.

Based on our analysis of the language, we conclude that the phrase "general metropolitan election" as used in section 15.03 of the Charter is not ambiguous. As used in this section of the Charter, "general metropolitan election" means and is limited to the particular general election at which the Mayor, Vice Mayor, Councilmen-at-Large, and District Councilmen are elected in August of each fourth odd-numbered year, beginning in 1971, as called for in section 15.01 of the Charter.[9] The next "general metropolitan election" is the August 2019 election. Because the date of that election is more than twelve months from the date of the mayoral vacancy, section 15.03 of the Charter requires that a special election be set in accordance with Tennessee Code Annotated section 2-14-102. Under the facts of this case, the interplay between this statute and section 15.03 of the Charter does not authorize the Commission to set the election to fill the mayoral vacancy on the date of the August 2, 2018 general election.

Although we have concluded that the relevant Charter language is not ambiguous, we do note that our construction of the language of section 15.03 of the Charter is

---

[9] Citing Town of Linden v. Garcia, No. M2000-01776-COA-R3-CV, 2001 WL 856596 (Tenn. Ct. App. July 31, 2001), Metro and the Commission contend that the phrase "general metropolitan election" may not be so narrowly construed as to exclude other general elections in the absence of express limiting language. While undefined, the phrase is not without limiting language, however. The use of the term "metropolitan" in the phrase serves to limit the broader phrase "general election" as used elsewhere in this section and in the Charter. This distinguishes this case from Garcia. Moreover, we have not in the past refused to place limits on language in the Charter when such limits are clear from the purpose and function of the provision at issue. See, e.g., State ex rel. Wise v. Judd, 655 S.W.2d 953 (Tenn. 1983) (holding that the phrase "preceding general election" as used in section 19.01 of the Charter is limited to municipal general elections and excludes state or federal general elections).

consistent with the legislative history of this section.[10]  The current version of section 15.03 is the result of a 2007 resolution of the Metropolitan Council, approving the amendment of the section and placing it on the ballot for the approval of the voters pursuant to section 19.01 of the Charter.  Section 19.01 of the Charter requires that the ballot "set forth a brief description of the amendment worded so as to convey the meaning of said amendment, said description to be set forth in the original amendatory resolution."  The 2007 amendatory resolution and the ballot contained the following summary of the amendment to section 15.03: "This amendment would require that a special election be held to fill a vacancy in the office of mayor and a vacancy in the office of district councilmember whenever more than twelve (12) months remain in the unexpired term."  Metropolitan Council Resolution No. RS2007-1846 (Approved June 5, 2007); August 2, 2007 ballot.  This Court has noted that the sufficiency of this type of ballot summary is to be judged by whether it gives a voter sufficient information to advise him of the question; that is, does it "convey[] a reasonable certainty of meaning so that a voter could intelligently cast a vote for or against the proposal with full knowledge of the consequence of his vote."  Rodgers v. White, 528 S.W.2d 810, 813 (Tenn. 1975); see Pidgeon-Thomas Iron Co. v. Shelby Cnty., 397 S.W.2d 375, 378 (Tenn. 1965).  The Commission, in its motion to dismiss in the trial court, asserted that "[t]his summary was approved by the Metro Council and therefore the Council must have considered the summary a fair representation of the Charter Amendment."  As we read the summary contained in the amendatory resolution and on the ballot, amended section 15.03 keys the requirement for a special election to fill a vacancy in the Office of Mayor to the length of the term of office remaining at the time of the vacancy.  The term of office runs to the next "general metropolitan election" at which the Mayor is elected pursuant to section 15.01 of the Charter.  Thus, the requirement of a special election is dependent on the time remaining from the date of the vacancy to the date of the next "general metropolitan election" at which the Mayor is elected pursuant to section 15.01, not the time remaining to the date of any other type of municipal general election.

Our construction of the language of section 15.03 of the Charter also is consistent with the public policy regarding the nature of elections for the Office of Mayor.  As expressed in a 2011 resolution of the Metropolitan Council, it was the intent of the founders of the Metropolitan Government, and remains the intent of the Council, that the Office of Mayor be non-partisan and that the election for this office not be held in conjunction with partisan elections.  Metropolitan Council Resolution No. RS2011-1607 (Approved April 21, 2011).  As the Council expressed in its resolution, having the election for this office coincide with partisan elections "would negatively impact the

---

[10] Because we have concluded that the language is unambiguous, a review of the relevant legislative history is not necessary to our decision.  However, we have chosen to address some of these matters to show additional support to our conclusion here today.

- 10 -

democratic process and destroy the purpose of having a non-partisan elected body." The August 2, 2018 election includes a general election for a number of Metropolitan offices, but also includes partisan primary elections for state and federal offices. Despite Metro's and the Commission's assertion to the contrary, we discern no logical basis for distinguishing between a partisan presidential election, as was the specific subject of the 2011 resolution, and any other partisan election. Setting the election to fill the vacancy in the Office of Mayor to coincide with these partisan primaries contravenes this express public policy of non-partisan mayoral elections.[11]

Metro and the Commission also contend that we previously decided the issue in this case and reached a contrary conclusion in State ex rel. Wise v. Judd, 655 S.W.2d 952 (Tenn. 1983). We disagree. The meaning of the phrase "general metropolitan election" as used in section 15.03 of the Charter and whether that phrase and the phrase "general election" as used in the Charter have the same meaning were not before the Court in Wise. In Wise, the parties did not raise or address, nor did the Court analyze, the issue which is now before us. Rather, the issue in Wise was whether the phrase "preceding general election" as used in section 19.01 of the Charter is limited to a municipal general election or includes a state or federal general election.[12] Id. at 953. There was in Wise

---

[11] Metro and the Commission, nonetheless, contend that the construction which we adopt is unreasonable because it would prejudice the public by shortening the election period. The shortened election period, however, is not the result of our construction of the Charter. Rather, it is the result of the statutory time-frame for special elections. Tennessee Code Annotated section 2-14-102 provides:

(a) Special elections shall be held not less than seventy-five (75) days nor more than eighty (80) days after the officer or body charged with calling the election receives notice of the facts requiring the call. An election for an office shall be held on the same day in every county in which it is held.

(b)(1) If it is necessary to hold a special election to fill a vacant seat in the United States house of representatives, a vacancy in a county office, or a vacancy in any municipal office, and the date for such election, as established under subsection (a), falls within thirty (30) days of an upcoming regular primary or general election being held in that district, the governor, or the county election commission, as specified in § 2-14-103, may issue the writ of election for the special election for the date which will coincide with the regular primary or general election.

(2) If the date of the election is adjusted, as provided in subdivision (b)(1), all other dates dependent on the date of election shall be adjusted accordingly, and any filing of candidacy, or qualifying petitions, financial statements, or other acts shall be timely done if performed in accordance with the revised dates.

It is not our place to judge the wisdom of this statute or of the Charter provision at issue.

[12] Section 19.01 of the Charter provides in pertinent part:

- 11 -

no dispute that both the August 1979 "general metropolitan election" and the August 1982 "general election" were municipal general elections which would qualify for purposes of section 19.01. <u>Id.</u> The question was whether the November 1982 state general election also would qualify. <u>Id.</u> Our holding in <u>Wise</u> was that the phrase "preceding general election" as used in section 19.01 of the Charter refers to *municipal* general elections, not to *state or federal* general elections. <u>Id.</u> We did not hold, nor did we intend to hold, that the phrases "general metropolitan election" and "general election" are synonymous for purposes of section 15.03 of the Charter.

### III. CONCLUSION

For the reasons stated herein, the judgment of the trial court is reversed. The Commission is hereby ordered to set a special election in accordance with Tennessee Code Annotated section 2-14-102(a).[13] This opinion is not subject to rehearing under

---

This Charter may be amended subsequent to its adoption in the following manner:

An amendment or amendments may be proposed (1) by the adoption of a resolution by the council favoring the same and submitting it or them to the people for approval. The affirmative vote for adoption of such resolution in the council shall be not less than two-thirds of the membership to which the council is entitled, and such resolution when adopted need not be submitted to the mayor for his approval; or (2) upon petition filed with the metropolitan clerk, signed by ten (10) per cent of the number of the registered voters of Nashville-Davidson County voting in the *preceding general election*, the verification of the signatures to be made by the Davidson County Election Commission and certified to the metropolitan clerk.

(Emphasis added).

[13] Pursuant to the statute, the Commission is required to set the special election not less than seventy-five (75) nor more than eighty (80) days after the Administrator of Elections received notice of the vacancy. Tenn. Code Ann. § 2-14-102(a). At its discretion, the Commission alternatively may set the special election to coincide with the date of a regular primary or general election, if the date of such election is within thirty (30) days of the time frame otherwise specified for a special election. Tenn. Code Ann. § 2-14-102(b)(1). Mr. Wallace has suggested that the Commission, therefore, may set the special election on May 1, 2018, the date of a scheduled referendum election and primary elections. The Commission has responded that the May 1, 2018 election is not a general election and so not a date on which the special election to fill the vacancy for the Office of Mayor properly may be set. We need not resolve this question, however, because the Commission voted at its March 9, 2018 meeting against setting the election on May 1, 2018. This was within the discretion afforded the Commission under the statute. In addition, we note that the deadlines for various election-related actions set out in the relevant statutes and set out in the Commission's pleadings in this Court indicate that it now would be a practical impossibility to set the special election for May 1, 2018.

Tennessee Rule of Appellate Procedure 39, and the Clerk is directed to certify this opinion as final and to immediately issue the mandate. [14] Costs of this appeal are taxed to the Defendants, for which execution may issue if necessary.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

---

[14] Metro and the Commission urge that we afford our decision prospective application. They appear, however, to recognize that the circumstances of this case do not support prospective application under our jurisprudence. See, e.g., Hill v. City of Germantown, 31 S.W.3d 234, 239 (Tenn. 2000); Calaway v. Schucker, 193 S.W.3d 509, 518 (Tenn. 2005). They, therefore, offer a unique mechanism to effectively accomplish the same result. They suggest that we deem the date of our ruling in this case to be the date on which "the officer or body charged with calling the [special] election receives notice of the facts requiring the call," thereby triggering the statutory time-frame for setting the special election. Tenn. Code Ann. § 2-14-102. They further suggest that we time the issuance of our ruling to cause the August 2, 2018 date previously set by the Commission to fit within the statutory time-frame for a special election. What Metro and the Commission suggest is tantamount to inviting us to judicially amend the statute. We recognize that consequences of the result reached here today include additional expense to Metro, scheduling issues, and logistical problems in conducting a special election. However, we are unable to consider these consequences in reaching our decision. Our responsibility remains resolute: To interpret the law rather than make the law. As a result, we decline this invitation by Metro and the Commission.